**FIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Florida Power & Light Company
and JEA,

      Plaintiffs,

         Case No. 1:22-cv-1798-MLB

v.

Georgia Power Company, et al.,

      Defendants.

_____/

## <u>OPINION & ORDER</u>

For the reasons set forth below, the Court **GRANTS** the motions to dismiss filed by Defendants Georgia Power Company, Oglethorpe Power Company, Municipal Electric Authority of Georgia, and the City of Dalton.  (Dkts. 68, 69, 70, 71.)

## I. Background

The Robert W. Scherer Plant ("Plant Scherer") is a coal-fired power plant with four power generating units.  (Dkt. 65 ¶ 1.)  Defendants Georgia Power Company ("Georgia Power"), Municipal Electric Authority of Georgia ("MEAG"), Oglethorpe Power Company ("Oglethorpe") and the

City of Dalton ("Dalton") jointly own Units 1 and 2.  (*Id.* ¶ 2.)  Georgia Power and Plaintiff Florida Power & Light Company ("FPL") jointly own Unit 3.  (*Id.* ¶ 3.)  Plaintiffs FPL and Jacksonville Electric Authority ("JEA") jointly own Unit 4.  (*Id.*)  Collectively, Plaintiffs and Defendants are "Owners" of Plant Scherer.  (*Id.* at 8.)  This case arises from Plaintiffs' decision to retire Unit 4 in 2021, Georgia Power's and Plaintiff FPL's decision to retire Unit 3 in 2028, and Defendants' decision to impose costs on Plaintiffs for facilities that will be constructed and used after Units 3 and 4 are retired.  (*Id.* ¶¶ 6–7, 10–11.)

## A.    Contractual Framework

The parties have a series of agreements that set forth their roles, rights, and obligations toward one another in owning and running Plant Scherer and the individual units.  All the parties, for example, signed the Plant Scherer Managing Board Agreement ("Managing Agreement"), which governs management of Plant Scherer.  (*Id.* ¶ 33; Dkt. 65-1 (Managing Agreement).)  The Managing Agreement established the Managing Board, which consists of a person designated by each owner—that is, all the parties to this case.  (Dkt. 65-1 at 23.)  The Managing Agreement states that each board member "shall be

authorized to represent the Owners which appointed him or her and shall have the authority to obligate such Owner." (*Id.* at 24.)

Georgia Power and Plaintiff FPL also executed the Unit 3 Operating Agreement and Unit 3 Ownership Agreement, referred to as the "Unit 3 Participation Agreements" to govern management of Unit 3. (Dkts. 65 ¶¶ 33, 38; 65-5 (Unit 3 Operating Agreement); 65-6 (Unit 3 Ownership Agreement).) Likewise, Plaintiffs and Georgia Power signed the Unit 4 Operating Agreement, the Unit 4 Ownership Agreement, and the Unit 4 Accounting Agreement, which Plaintiffs refer to as the Unit 4 Participation Agreements and which govern management of Unit 4.[1] (Dkts. 65 ¶¶ 33, 37; 65-2 (Unit 4 Operating Agreement); 65-3 (Unit 4 Ownership Agreement).)

This lawsuit involves costs for so-called common facilities—generally defined as facilities at the plant that are shared by some combination of the separate power generating units. The Units 3

---

[1] Plaintiffs include the Unit 4 Accounting Agreement in their definition of the "Participation Agreements." (Dkt. 65 ¶ 41.) But the Unit 4 Operating Agreement does not include the Accounting Agreement in that definition. (Dkt. 65-2 at 23.) Plaintiffs claim it is somehow "incorporated by reference" but does not really explain that logic. (Dkt. 65 ¶ 41.)

and 4 Operating Agreements provide a more precise definition.  They define "Plant Scherer Common Facilities" as all real and personal property "intended to be used in common" by one or both of Units 1 and 2 and one or both of Units 3 and 4.  (Dkts. 65 ¶ 49; 65-5 at 26; 65-2 at 22.) So the definition excludes real and personal property used only by Units 1 and 2 or only by Units 3 and 4.  The Ownership Agreements state that the parties own the Plant Scherer Common Facilities as tenants in common based on their pro rata ownership of the individual units. (Dkts. 65-6 at 80–81; 65-3 at 84–85.)   The Operating and Ownership Agreements state that, unless expressly provided, costs arising from the Plant Scherer Common Facilities are shared in proportion to a party's ownership interest therein.  (Dkts. 65-6 at 81; 65-5 at 8, 91–92; 65-3 at 85; 65-2 at 8, 66.)  In the Managing Agreement, the parties agreed that the allocation of costs for the Plant Scherer Common Facilities can be changed only with the approval of all parties.  (Dkt. 65-1 at 75.)

The Managing Agreement names Georgia Power as the "Common Facilities Agent" for all Plant Scherer Owners.[2]  (Dkts. 65 ¶ 54; 65-1 at 12.)  As such, Georgia Power operates Plant Scherer and its common facilities on behalf of the other Owners and undertakes (among other things) planning, licensing, design, construction, operation, maintenance, renewal, addition, and replacement of (among other things) the Plant Scherer Common Facilities.  (Dkt. 65 ¶ 58; 65-1 at 10–11.)[3]

The Managing Agreement also sets forth the budgeting process for the Plant Scherer Common Facilities.  It states that the Managing Board shall "review and approve, disapprove or revise and approve the Capital Budgets and Operating Budgets with respect to the Plant Scherer Common Facilities to be submitted annually (or more often upon revision

---

[2] Plaintiff FPL also appointed Georgia Power as its agent under the Unit 3 Participation Agreements.  (Dkt. 65 ¶ 153.)  Plaintiffs did the same under the Unit 4 Participation Agreements.  (*Id.* ¶ 152.)

[3] Strangely, Plaintiffs contend this provision of the Managing Agreement imposes obligations on Georgia Power regarding "funding" and "implementing various owner-approved budgets."  (Dkt. 65 ¶ 58.)  It does not.  As explained, separate provisions impose those obligations.

by the Common Facilities Agent) by the Common Facilities Agent, all pursuant to Article 5.1 hereof." (Dkt. 65-1 at 26.)

Article 5.1 outlines the annual budgeting process for the Plant Scherer Common Facilities. Specifically, each owner may provide Georgia Power (the Common Facilities Agent) "information to be used in the formulation" of the next year's capital budget and operating budget for the Plant Scherer Common Facilities. (*Id.* at 36.) Georgia Power has a certain amount of time to prepare and submit a proposed annual budget for approval "by the Board by Requisite Owner Approval." (*Id.*) This requires approval by "Owners who collectively hold at least 76% of the undivided ownership interest" in the power generating units. (*Id.* at 18 (defining "Requisite Owner Approval").) If enough of the Owners do not approve the proposed budget within the required time, the Managing Board may adopt a revised budget, again by Requisite Owner Approval. Article 5.1 states that any revised budget adopted by the Managing Board in this situation "shall comply with the Prudent Utility Practice" and legal requirements. (*Id.* at 37.) If the Managing Board fails to adopt a revised budget within a certain time, the initial budget submitted by Georgia Power automatically becomes binding. (*Id.*) Specifically,

Article 5.1 explains that, if the Managing Board is unable to approve any other proposed budget, "then the budget to be utilized shall be the one submitted by [Georgia Power], and such budget shall be deemed approved by the Board and binding on the Owners." (*Id.*)

The Managing Agreement states that the initial budget Georgia Power proposes must "conform to the requirements and guidelines stated in Appendix A." (*Id.* at 36.) That appendix (titled "Guidelines for Capital Budgets and Operating Budgets for Plant Scherer") repeats some of Article 5.1 but also provides additional obligations. As to Georgia Power's initial proposed budget, it states that, among other things: (1) each owner can provide Georgia Power information it "wishes to be utilized [by Georgia Power] in formulation of budgets for the following calendar year"; (2) Georgia Power must prepare and submit "a written budget estimate of Operating Costs and Cost of Construction for the Plant Scherer Common Facilities"; and (3) Georgia Power's budget "shall be based on information reasonably available . . . [and] shall be in a format that reflects the amounts [Georgia Power] would expect to bill each Owner pursuant to the underlying Participation Agreements." (*Id.* at 71.) Appendix A then recounts the approval process from Article 5.1,

specifically that, if the Managing Board does not approve Georgia Power's proposed budget by Requisite Owner Approval, the Managing Board "by approval of a majority" may "submit an alternative revised" budget that complies with the Prudent Utility Practice but that, if the Managing Board fails to do so, "the budget to be used shall be the one submitted by [Georgia Power], and such Budget be deemed approved by the Board and binding on all of the Owners to which such Budget applies." (*Id.* at 72.)   As explained, both Article 5.1 and Appendix A recognize the possibility that, if the Owners reject Georgia Power's proposed budget but fail to adopt a revised budget within a certain time, Georgia Power's initial budget becomes effective automatically.

### B.   New Environmental Regulations

In 2020, the U.S. Environmental Protection Agency released new effluent limitation guideline ("ELG") regulations applicable to Plant Scherer and other coal-fired electric power plants.  (Dkt. 65 ¶¶ 14, 65.) The regulations allow operators to comply with the new requirements by constructing new facilities to handle waste streams from active units or by retiring subject units.  (*Id.* ¶ 68.)  To comply with the ELG regulations, Plaintiffs decided to retire Unit 4, and Georgia Power and Plaintiff FPL

decided to retire Unit 3. (*Id.* ¶¶ 6, 7.) Neither will reverse their decision. (*Id.* ¶ 12.) Defendants, however, decided against retiring Units 1 and 2, instead electing to build new facilities to comply with the regulations. (*Id.* ¶¶ 8, 9.) The facilities include new landfills and cells to store the by-products of coal combustion and a new wastewater treatment facility ("new facilities"). (*Id.* ¶ 9.)

### C.   Fallout and the Present Suit

Understandably, Plaintiffs do not want to pay for the new facilities. So, in September 2020, Plaintiff FPL informed Georgia Power of Plaintiffs' decision to retire Unit 4. (*Id.* ¶ 78.) About a week later, all the Owners met in preparation for an upcoming board meeting for consideration and approval of the 2021 common facilities budget. (*Id.* ¶ 79.) Plaintiffs again explained their decision to retire Unit 4, and Plaintiff FPL explained Plaintiffs would not be responsible for future ELG-related capital and operating costs, including costs for constructing the new facilities. (*Id.* ¶¶ 79, 81.) Plaintiffs repeated their position at the board meeting, saying "they should not be obligated for investment costs related to the [new facilities], which would be incurred years after the retirement of Unit No. 4." (*Id.* ¶ 81.) Despite that, Georgia Power

9

proposed a budget that attributed costs for the new facilities to Plaintiffs. (*Id.* ¶ 82.) Plaintiffs voted against the budget. (*Id.* ¶ 83.) Oglethorpe, MEAG, and Dalton argued that, even if the owners of a unit elect to retire their unit, the owners of that unit should still be responsible for costs associated with the new facilities. (*Id.* ¶ 84.) After the meeting, Plaintiff FPL submitted a "revised alternate 2021 budget" that eliminated allocation of ELG-related capital and operating and maintenance costs to Unit 4 owners. (*Id.* ¶¶ 85, 105.) Although not specifically alleged, it appears the Managing Board rejected Plaintiff FPL's revised 2021 budget, and Georgia Power's budget became binding.

Plaintiff FPL continued to complain about allocation of costs to Unit 4. (*Id.* ¶¶ 86–87.) It repeated this throughout the parties' discussion of the 2022 budget. (*Id.* ¶¶ 88–104.) As part of that budgeting process, Georgia Power proposed a Unit 4 business plan for 2022-2026 that attributed costs for the new facilities to Unit 4, Plaintiff FPL submitted an "amended motion" to Georgia Power that objected to the allocation, and Defendants responded by saying the Managing Agreement and other contracts did not contemplate changes to allocations of common facilities costs upon the retirement of a unit. (*Id.*

¶¶ 89–98.)  Plaintiffs don't allege that Georgia Power proposed a 2022 budget, but it must have done so because Plaintiffs allege that, at the September 2021 budget meeting, they "voted down" several budgets: the 2022 proposed common facility operation and maintenance budget (along with the common facility capital budget), the 2022 proposed Units 3 and 4 common operation and maintenance budget, an environmental capital budget, and the 2022 proposed Units 3 and 4 common capital budgets. (*Id.* ¶ 99.)[4]  Plaintiffs submitted proposed, revised budgets and, at a subsequent meeting, continued to insist they should not have to bear any costs associated with the new facilities since Units 3 and 4 will not use them.  (*Id.* ¶¶ 100–01.)

In October 2021, Georgia Power sent revised 2022-2026 business plans for Unit 4, again allocating the costs at issue to Unit 4 owners.  (*Id.* ¶ 103.)  Plaintiff FPL objected to those business plans.  (*Id.* ¶ 104.)  Later that month, Plaintiffs "submitted an alternate Common Facilities

[4] How these budgets differ Plaintiffs do not explain, but apparently, they in some way or another attributed costs for construction of the new facilities to Unit 3 and 4 owners.  Plaintiffs also do not explain exactly when Plaintiff FPL (and Georgia Power) announced their decision to retire Unit 3, but it must have happened before this because (as explained) Plaintiffs objected to allocation of costs to that unit as well.

operations and maintenance budget and an alternate Common Facilities capital budget in response to the budgets proposed by Georgia Power at the September 30, 2021 Board meeting." (*Id.* ¶ 105.) In November 2021, Georgia Power told Plaintiff FPL that it had spoken with the other Owners and they had (as a group) rejected Plaintiffs' alternative budget. (*Id.* ¶¶ 106, 108.) As a result, the initially-proposed budget—that attributes the contested costs to Plaintiffs—became effective. (*Id.*)

Plaintiffs filed suit for declaratory judgment. (Dkt. 1.) After briefing, the Court held a hearing and dismissed the original complaint with leave to amend. (Dkts. 62, 63.) Plaintiffs filed an amended complaint, alleging breach of contract against Georgia Power (Count I), breach of contract against all Defendants (Count II), declaratory judgment against all Defendants (Count III), and breach of fiduciary duty against Georgia Power (Count IV). (Dkt. 65.) Defendants move to dismiss Plaintiffs' amended complaint. (Dkts. 68, 69, 70, 71.)

## II.   Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This requires more than a "mere possibility of misconduct." *Id.* at 679. Plaintiffs' well-pled allegations must "nudge[] [his] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III. Discussion

As the Court noted, Plaintiffs' initial complaint was difficult to follow and did not clearly assert any breach of contract or right to relief. (Dkt. 58.) After a hearing, the Court permitted Plaintiffs an opportunity to amend their complaint. At the heart of Plaintiffs' amended complaint remains its allegation that the new facilities should not be considered Plant Scherer Common Facilities under the Managing Agreement and Participation Agreements. That is simple enough. As already explained, those agreements define Plant Scherer Common Facilities as "all the property, both real and personal, intended to be used in common by, or in connection with, one or both of Scherer Unit No. 1 and Scherer Unit No. 2 and one or both of Scherer Unit No. 3 and Scherer Unit No. 4." (Dkt. 65-2 at 22.) "Plant Scherer Common Facilities" also include "the

13

equipment and facilities listed" in exhibits to the Units 3 and 4 Ownership Agreements. (*Id.*; Dkt. 65-5 at 26.) Those exhibits list ash handling and water treatment systems. (Dkts. 65-3 at 214; 65-6 at 203.) The Participation Agreements further state that Plant Scherer Common Facilities include additional facilities that may be constructed "which are intended to be used in common" in the same manner provided that (among other things) "the acquisition of such . . . additional facilities . . . shall be necessary in order to keep one or both of Scherer Unit No. 1 and Scherer Unit No. 2 and one or both of Scherer Unit No. 3 and Scherer Unit No. 4 in good operating condition or to satisfy the requirements of any Governmental Authority having jurisdiction over one or both of Scherer Unit No. 1 and Scherer Unit No. 2 and one or both of Scherer Unit No. 3 and Scherer Unit No. 4." (Dkt. 65-2 at 22–23.)

Plaintiffs argue the new facilities are not Plant Scherer Common Facilities because both Units 3 and 4 will retire before the new facilities become functional, so they are not "intended to be used in common by, or in connection with, one or both of Scherer Unit No. 1 and Scherer Unit No. 2 and one or both of Scherer Unit No. 3 and Scherer Unit No. 4." (Dkts. 65 ¶ 117; 65-2 at 22).

Dalton says the Court should not credit Plaintiffs' allegations because their theory has not accrued. (Dkt. 71 at 29.) Dalton explains the Court cannot assess whether Units 3 and 4 will use or intend to use the new facilities because the facilities do not yet exist. (*Id.* at 27–29.) Dalton thus challenges Plaintiffs' factual allegations. But at the motion to dismiss stage, the Court must accept Plaintiffs' allegations as true. *Iqbal*, 556 U.S. at 678. MEAG contends Plaintiffs essentially concede the new facilities were intended to be Plant Scherer Common Facilities because Plaintiffs allege the money was budgeted in 2019, before Plaintiffs announced their plans to retire Units 3 and 4. (Dkt. 68-1 at 22–23.) But the amended complaint says that, in 2019, the capital budget allocated money to address the ELG regulations. (Dkt. 65 ¶ 77.) It does not say the money was budgeted for the new facilities specifically.[5]

Georgia Power argues the new facilities are Plant Scherer Common Facilities because they are additional environmental compliance

---

[5] To the extent Defendants raise new arguments about whether the new facilities are Plant Scherer Common Facilities in their replies, the Court will not consider them. *United States v. Ga. Dep't of Natural Res.*, 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) ("This court will not consider arguments raised for the first time in a reply brief.").

facilities "intended to be used in common by, or in connection with, each of the four units at Plant Scherer." (Dkt. 69-1 at 10.) It adds that these costs previously were included as Plant Scherer Common Facilities, and Plaintiffs' subsequent decision to retire Units 3 and 4 does not change the proper characterization of the facilities as Plant Scherer Common Facilities. (*Id.* at 10–11.) Plaintiffs respond that the parties' course of dealing undermines Georgia Power's interpretation of the agreement because, as new landfills were constructed in the past, the Managing Agreement was updated to expressly include those facilities. (Dkt. 77 at 5.) That might be a real dispute. And given Plaintiffs' insistence that "course of dealing" evidence supports their argument, that might be enough to allege plausibly that the new facilities fall outside the definition of Plant Scherer Common Facilities. *See also* Ga. Code Ann. § 11-1-303 (explaining that a course of dealing may be used to interpret an express contract).

The issue presented, however, is whether Plaintiffs have a contractual right to dispute the contrary interpretation adopted by Defendants, specifically whether: (1) Georgia Power breached any contract when it included costs for the new facilities in the 2021 and 2022

16

proposed budgets for Plant Scherer Common Facilities and (2) all Defendants breached any contract when they rejected Plaintiffs' revised budgets that excluded those costs. This is what Plaintiffs struggle to plausibly allege. The Court has difficulty following Plaintiffs' contractual theory. Bouncing from one agreement with certain obligations in certain situations to other agreements with other obligations in other situations, Plaintiffs amass a tangled skein of contractual rights that settles on an obligation by all Defendants to follow a so-called "Prudent Utility Practice" and some concept of "fairness" and "equity" in the budgeting process. (Dkt. 65 ¶ 126.) They then assert from whole cloth an obligation on all Defendants to do things like "engage in meaningful dialogue," "independently determine" how costs should be allocated, and vote some way other than "up or down." (*Id.* ¶¶ 45, 138.) The Court has given Plaintiffs an opportunity to reallege their contract claim, but the more Plaintiffs say, the less the Court knows.[6]

Indeed, one defendant moves to dismiss Plaintiffs' amended complaint as a shotgun pleading. (Dkt. 70-1 at 8–11.) The Court finds

---

[6] Taylor Swift, *willow*, *on* Evermore (Republic Records 2020).

that a close call.  The first three counts incorporate all prior paragraphs, and Plaintiffs use vague terms throughout without specifying the agreement to which they refer or from where they derived certain contractual provisions.  Plaintiffs, for example, say Georgia Power breached "the foregoing agreements," having previously referred to numerous provisions of *six different contracts*.  (Dkt. 65 ¶ 126.)  And they identify five different ways in which Georgia Power allegedly did so.  But only one defendant moves to dismiss the amended complaint as a shotgun pleading.  And, based on Defendants' motions to dismiss, it appears Defendants have (or believe they have) adequate notice of the claims against them.  *See Yeyille v. Miami Dade Cnty. Pub. Sch.*, 643 F. App'x 882, 884 (11th Cir. 2016).[7]  So the Court declines to dismiss the amended complaint as a shotgun pleading and has painstakingly tried to make sense of Plaintiffs' assertions.  To the extent the Court has misunderstood parts of the amended complaint, the fault lies with Plaintiffs.

---

[7] The Court recognizes *Yeyille* is unpublished and nonbinding.  The Court cites it as instructive nonetheless.  *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

### A.    Count I

The elements of a breach of contract claim are "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 590 (2013) (citing *Norton v. Budget Rent A Car Sys.*, 307 Ga. App. 501, 502 (2010)).

Plaintiffs allege Georgia Power breached the Managing Agreement, the Participation Agreements, and the Accounting Agreement "by failing to follow Prudent Utility Practice, fairness, and equity" when it: (1) proposed the Unit 4 business plan that ignored the fact that Unit 4 would never use the new facilities; (2) mis-defined certain costs for the new facilities as Plant Scherer Common Facilities; (3) proposed a revised budget that again mis-defined and mis-allocated these costs; (4) voted to approve the revised budget; and (5) rejected Plaintiffs' revised budget and imposed the previously contested budgets.  (Dkt. 65 ¶¶ 123, 126.) Georgia Power says the Prudent Utility Practice does not address the allocation of common costs and that the Accounting Agreement procedures do not apply to this dispute.  (Dkt. 69-1 at 8–16.)

19

Plaintiffs' first alleged breach is dead on arrival.  Plaintiffs allege Georgia Power's proposed business plans violated the Prudent Utility practice, fairness, and equity.  Plaintiff, however, identifies no contract that discusses business plans or Georgia Power's obligations in creating or providing business plans.  Plaintiffs identified no provision that obligated Georgia Power to follow the Prudent Utility Practice, fairness, or equity when creating business plans.  And it does not allege that the business plans caused the imposition of costs on Plaintiff.  To the contrary, Plaintiffs allege that happened because of the proposed budgets, not previous business plans.  (Dkt. 65 ¶ 106.)[8]

Plaintiffs' fourth alleged breach also fails immediately.  Defendants did not vote to approve the revised budget.  The 2022 budget became applicable—as Plaintiffs allege and as discussed in more detail

_____

[8] The Court notes the Unit 4 Operating Agreement imposes some obligations on Georgia Power regarding the creation of business plans for the unit.  (Dkt. 65-2 at 37-38.)  It provides that, if the Unit 4 operating committee does not adopt Georgia Power's proposed business plan, the committee must establish a budget that "shall be sufficient to ensure compliance with the Prudent Utility Practice."  (*Id.*)  It does not, however, require Georgia Power to do that in proposing the business plan.  (*Id.*)  Regardless, it is not clear the Unit 4 business plan involves common facilities, that process is not at issue here, and Plaintiffs don't even mention this provision in the Amended Complaint.

below—when Defendants rejected Plaintiff FPL's proposed alternative budget.  (*Id.*)   Indeed, Plaintiffs' only allegation involving a "vote" concerns the motion Plaintiff FPL submitted in 2021, not the budget.  (*Id.* ¶ 95.)  Plaintiffs may not proceed on these claims.

The Court thus considers whether Plaintiffs' second, third, and fifth allegations state a claim for breach of contract.  To be clear, the Court considers whether, as part of the 2022 budgeting process, Georgia Power breached any of the contracts identified by not following Prudent Utility Practice, fairness, or equity when it proposed a budget that included costs for the new facilities as Plant Scherer Common Facilities and rejected Plaintiffs' revised budget.[9]

### 1.    Prudent Utility Practice

Plaintiffs say Georgia Power had an obligation under the Unit 4 Accounting Agreement and the Managing Agreement to allocate costs

---

[9] It is not clear if Plaintiffs' breach of contract claim involves the 2021 budget.  After all, while Plaintiffs allege that Plaintiff FPL objected to the imposition of costs for the new facilities on Unit 4 owners, voted against Georgia Power's proposed budget, and submitted a revised budget, Plaintiffs do not allege the adoption of the 2021 budget or explain the process by which that came about.  (Dkt. 65 ¶¶ 81, 83, 85.)  But it does not really matter as the analysis is the same.

and propose budgets according to the Prudent Utility Practice.  (Dkt. 65

¶ 123.)   They claim Georgia Power violated that obligation when it

treated costs for the new facilities as Plant Scherer Common Facilities,

proposed a "revised budget" that included those costs, and rejected

Plaintiffs' "revised budget."   (*Id.* ¶ 126.)   The Managing Agreement

defines Prudent Utility Practice as:

> [A]ny of the practices, methods and acts engaged in or
> approved by a significant portion of the electric utility
> industry prior to such time, or any of the practices, methods
> and acts which, in the exercise of reasonable judgment in light
> of the facts known at the time the decision was made, could
> have been expected to accomplish the desired result at the
> lowest reasonable cost consistent with good business
> practices, reliability, safety and expedition.  'Prudent Utility
> Practice' is not intended to be limited to the optimum practice,
> method or act to the exclusion of all others, but rather to be a
> spectrum of possible practices, methods or acts having due
> regard for, among other things, manufacturers' warranties
> and the requirements of Governmental Authorities of
> competent jurisdiction and the requirements of the
> Participation Agreements.

(Dkt. 65-1 at 17.)

Again, Plaintiffs say the Prudent Utility Practice applies broadly to

Georgia Power as the Common Facilities Agent, including when Georgia

Power sets budgets.   (Dkt. 77 at 8.)   Georgia Power says the Prudent

Utility Practice addresses the operation of the plant consistent with

accepted industry practices, not the allocation of costs among co-owners in accordance with the provisions of the parties' agreements. (Dkt. 69-1 at 11.) The Court agrees with Georgia Power.

Nothing in the definition of Prudent Utility Practice or the budgeting process suggests that the standard applies to allocation of costs among co-owners in the budgeting process. Rather, it appears to invoke a general standard for how various utility-related obligations are implemented. It refers to the "practices . . . approved by a significant portion of the electric utility industry" or that would be "expected to accomplish the desired result at the lowest reasonable cost consistent with good business practices, reliability, safety and expedition." (Dkt. 65-1 at 17.) This sounds like practices for running a utility safely and efficiently, not how to allocate costs between business partners. The provision also states that the Prudent Utility Practice is not the "optimum practice" but a "spectrum of possible practices, methods or acts" that considers (among other things) "manufacturers' warranties and the requirements of Governmental Authorities of competent jurisdiction"—again describing a range of behaviors more akin to operations rather than cost allocation. (*Id.*) One would not expect

business partners to consider warranties and government regulations in deciding how to equitably allocate costs between them. But one would certainly consider those things in determining how to operate a utility. Another provision of the Managing Agreement applies the Prudent Utility Practice to the physical separation of the Plant Scherer Coal Stockpile. (*Id.* at 43.) This provision buttresses the plain reading of the Prudent Utility Practice as applying to operational issues rather than budgeting for cost allocation.

Even if the Prudent Utility Practice applied to cost allocation, Plaintiffs allege—in a conclusory manner—that Georgia Power breached its obligations to perform under the Prudent Utility Practice. Plaintiffs failed to allege that Georgia Power's cost-allocation method would not have been approved by a significant portion of the electric utility industry or that it could not have been expected to accomplish the desired result (compliance with the ELG regulations) at the lowest reasonable cost consistent with good business practices, reliability, safety and expedition. So, even if this provision applied, their conclusory allegation cannot state a claim. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d. 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or

legal conclusions masquerading as facts will not prevent dismissal.").
Plaintiffs thus cannot establish that Georgia Power breached the
Prudent Utility Practice standard.

Other provisions of the Managing Agreement also preclude
Plaintiffs' argument that Georgia Power was required to follow the
Prudent Utility Practice in allocating costs—at least in the process
Plaintiffs allege in the amended complaint.  As explained above, Article
5.1 and Appendix A of the Managing Agreement set the guidelines for
capital and operating budgets for Common Facilities and explain Georgia
Power's obligations in proposing budgets.  Nothing in those sections
impose the Prudent Utility Practice on Georgia Power when proposing
budgets.  It is just not part of that language.[10]

---

[10] The Court has already explained is conclusion the Prudent Utility
Practice involves obligations Georgia Power (and perhaps others) must
follow in operating the plant rather than how it (or they) must allocate
costs or propose budgets.  For the remainder of this Order, the Court
assumes otherwise, that is, that the Prudent Utility Practice may be
imported into the actual budgeting process pursuant to Article 5.1 and
Appendix A of the Managing Agreement as Plaintiffs allege.  The Court
does so because, even if Plaintiffs are correct that the standard applies in
some budgeting instances, it did not arise in the budgeting process that
occurred in this case.

It seems Plaintiffs know this.  In their factual allegations, Plaintiffs refer to Georgia Power's 2020 and 2021 submissions to the Owners as "budgets" or "proposed budgets"—but never "revised budgets."  (*Id.* ¶¶ 82–83, 91, 99, 106.)[11]  They simply never allege the budgets Georgia Power submitted in 2020 and 2021 for cost allocation were "revised" budgets.  But then, in their contract claim allegations, they use that term, saying Georgia Power proposed a "revised" budget.  (Dkt. 65 ¶ 126(c).)

Why did Plaintiffs suddenly change terminology?  Maybe it was a mistake.  But maybe Plaintiffs were being more intentional and trying to inject the Prudent Utility Practice into Georgia Power's budgeting process where it does not belong.  (*Id.* ¶ 126; Dkt. 77 at 16–17.)  Article 5.1 of the Managing Agreement says a "*revised* Capital Budget or Operating Budget . . . shall comply with Prudent Utility Practice and Legal Requirements."  (Dkt. 65-1 at 37 (emphasis added).)  So maybe Plaintiffs insert the word "revised" into their contract allegations to

---

[11] Elsewhere, Plaintiffs refer to their own alternative budgets as "revised" (*id.* ¶¶ 85, 100), to a "revised" business plan that Georgia Power provided (*id.* ¶ 103), and to one discussion in 2019 about Georgia Power providing a revised budget because of the new regulations (*id.* ¶ 77).  But those agreements are not part of Plaintiffs' claim for breach of contract.

invoke this provision.  Indeed, that is exactly what they argue.  (Dkt. 77 at 16 (insisting the Prudent Utility Practice applies to budgets because "[Article] 5.1 of the Managing Agreement explicitly specifies that a revise capital budget or operating budget 'shall comply with the Prudent Utility Practice.'").)  But that provision explains that a "revised budget" is the budget that the Managing Board may adopt ***after*** rejecting Georgia Power's proposed budget.  (Dkt. 65-1 at 37.)  Article 5.1 does not say Georgia Power must propose a budget that complies with Prudent Utility Practice.  To the extent the Prudent Utility Practice applies to the allocation of costs (which it does not) it applies only to the "revised budget" that the Managing Board adopts.  Appendix A says the same. (*Id.* at 71–72.)

And, of course, that did not happen in this case.  The Managing Board never proposed a revised budget, and Georgia Power's initial budget was enacted because of the automatic enactment provisions of Article 5.1 and Appendix A.  The Court concludes Plaintiffs used the term "revised budget" in paragraph 126(c) to misconstrue what happened, a near admission that they cannot inject the Prudent Utility Practice under the provisions that actually apply to Georgia Power's conduct.  Again,

Plaintiffs point to no contract provision that required Georgia Power to apply the Prudent Utility Practice in "rejecting" Plaintiffs' proposed budget. Indeed, the agreements impose no standards by which an owner must evaluate another owner's budget—or at least Plaintiffs have identified none. So that allegation can provide no contract claim.

Finally, Georgia power did not "impose" the "previously contested budgets" as Plaintiffs allege. (Dkt. 65 ¶ 126(e).) While Plaintiffs use the word "impose" (*id.* ¶ 108), that is a mischaracterization of the automatic enactment provision of Article 5.1 and Appendix A of the Managing Agreement. The Court need not accept as true factual allegations that contradict the clear language of the contract. *Darrin Cupo, D.M.D, P.A. v. Orthodontic Centers of Am., Inc.*, 2008 WL 11333239, at *4 (S.D. Fla. Jan. 15, 2008) ("Where a cause of action stems from a contract that is attached to the complaint as an exhibit, the contract is considered part of the record for a Rule 12(b)(6) motion to dismiss. If the contract demonstrates unambiguously that the plaintiff's relief is not merited, the claims should be dismissed." (alteration omitted)).

The Court concludes Plaintiffs' reliance on the Prudent Utility Practice fails to state a breach of contract based on Georgia Power's

allocation of costs for the new facilities in the 2021 and 2022 proposed budgets or its rejection of Plaintiffs' revised budgets for the same years.

### 2.   Fair and Equitable Policy

Plaintiffs also say that, by mis-defining the new facilities as Plant Scherer Common Facilities, Georgia Power failed to allocate fairly and equitably costs to Plaintiffs under the Accounting Agreement.  (Dkt. 65 ¶¶ 126, 128.)

The Accounting Agreement provides:

> [i]f no accounting policy or allocation method or procedure has been specified herein, for a particular cost or cost component, [Georgia Power], as Agent, or the Scherer Unit No. 4 Participants shall propose a *fair and equitable* policy or allocation method to be used and submitted for approval by Scherer Unit No. 4 Participants and [Georgia Power], as Agent.

(Dkt. 65-4 at 9 (Accounting Agreement) (emphasis added).)  As Georgia Power points out, Plaintiffs do not allege the absence of an existing accounting policy or allocation method for the new facilities or that Georgia Power failed to *propose* a fair and equitable policy.  Rather, Plaintiffs bootstrap this provision into a general "fair and equitable" standard that (they say) controls Georgia Power's allocation of costs generally.  That is not what the contract says.  Plaintiffs' reliance on the

"fair and equitable" language in the Accounting Agreement fails to state a breach of contract based on Georgia Power's allocation of costs for the new facilities in the 2021 and 2022 proposed budgets or its rejection of Plaintiffs' revised budgets for the same years.

### 3.    Provision of Studies to Plaintiffs

Plaintiffs next allege Georgia Power breached the Managing Agreement by failing to provide requested information to Plaintiffs. (Dkt. 65 ¶ 129.)  Georgia Power disputes this, pointing out that Plaintiffs identify no contract provision requiring them to provide studies for compliance with the ELG regulations.  (Dkt. 69-1 at 16–17.)  The Court agrees with Georgia Power.  Plaintiffs identify no obligation by Georgia Power to provide such studies to Plaintiffs.  While Plaintiffs may have alleged that the Managing Board had an obligation to *conduct* studies (which Georgia Power allegedly did), Plaintiffs identify no provision requiring Georgia Power to *provide* the studies to Plaintiffs.  (Dkt. 65 ¶¶ 35, 164.)  Plaintiffs cannot establish a breach here either.

### 4.    Good Faith and Fair Dealing

Finally, Plaintiffs allege Georgia Power breached the implied covenant of good faith and fair dealing by improperly allocating costs to

Plaintiffs. (*Id.* ¶ 131.) As Georgia Power points out, it followed the express terms of the parties' agreements to impose a budget for the Plant Scherer Common Facilities. (Dkt. 69-1 at 17-18.) The Managing Board took it from there. Plaintiffs thus cannot establish a breach of the implied covenant of good faith and fair dealing. *Automatic Sprinkler Corp. of Am. v. Anderson*, 243 Ga. 867, 868 (1979) ("There can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give [it] the right to do."); *see also Metellis v. Bank of Am., N.A.*, 2016 WL 7985330, at *3 (M.D. Ga. Mar. 28, 2016) (citations omitted) ("Georgia law does not recognize an independent cause of action based on the covenant of good faith and fair dealing.").

For all these reasons, the Court dismisses Plaintiffs' breach-of-contract claim against Georgia Power.

### B.   Count II

Plaintiffs contend Georgia Power (in its capacity as a co-owner rather than as the Common Facilities Agent) and the other Defendant Owners violated the Managing Agreement by allowing Plaintiffs to be responsible for costs of the new facilities. (Dkt. 65 ¶ 138.) To get to that

conclusion, Plaintiffs cobble together inapplicable sections of sometimes inapplicable contracts to impose obligations that do not exist.   (*Id.* ¶¶ 42–45, 135–38.)[12]

As the first step in their creation of a contractual right, Plaintiffs allege that Appendix A to the Managing Agreement requires the Board to "perform its obligations in a way that is consistent with the unit-specific agreements, which are referred to as 'Participation Agreements.'"   (*Id.* ¶ 42.)   They claim this includes cost allocation, budgeting, operations, and maintenance.   (*Id.*)   That is not what Appendix A says.  It refers to Participation Agreements twice.  In the first instance, Appendix A says that, when Georgia Power initially proposes the Common Facilities budget, its proposal "shall be in a format that reflects the amounts GPC would expect to bill each Owner pursuant to the underlying Participation Agreements."  (Dkt. 65-1 at 71.)   That

---

[12] Defendant Dalton argues it has not waived sovereign immunity.  But it did so only in a footnote, incorporating by reference its previous argument on the issue.  (Dkt. 71 at 11 n.4.)  That, of course, allows Defendant Dalton to avoid briefing limitations.  The Court will not hunt and peck to determine applicable arguments, especially ones raised only in a footnote.  The Court permitted an amended complaint to streamline the process.  Defendant Dalton did not reassert the issue, and the Court will not address it.

provision imposes no obligation on the individual owners.  In the second instance, Appendix A says that, if the Managing Board adopts a revised budget, that budget (among other things) "shall comply with Prudent Utility Practice, Legal Requirements and all other requirements set forth in the Managing Board Agreements and the applicable Participation Agreements."  (*Id.* at 72.)  As already explained several times, that provision does not apply in this case because the Managing Board did not adopt a proposed budget.  Plaintiffs cite seven other sections of five different agreements to support their allegation that the Managing Agreement imposes some overarching obligation on Defendant Owners.  (Dkt. 65 ¶ 42.)  Plaintiffs do not discuss those provisions anywhere in their amended complaint, but the Court has reviewed them and none impose the obligation alleged.  Plaintiffs' contractual path towards the Defendant Owners fails at its first step.

As a second step, Plaintiffs allege each Participation Agreement requires Defendants to exercise their obligations as members of the Managing Board in accordance with the Prudent Utility Practice.  (*Id.* ¶¶ 43, 135.)  Plaintiffs cite no specific language from any agreement that expressly states this.  Plaintiffs merely make this bold allegation and cite

21 sections of six different contracts—totaling more than 250 pages—while quoting nothing from the contracts. (*Id.* ¶ 43.) The Court has reviewed those provisions and can find nothing to support Plaintiffs' conclusory assertion. From the Managing Agreement, for example, Plaintiffs cite the definition of the Prudent Utility Practice, the budgeting process in Article 5.1 and Appendix A, and two other sections that apply to unit common facilities (rather than plant-wide common facilities). None of those provisions impose an overarching obligation on the Defendant Owners to "exercise their obligations of the Plant Scherer Managing Board in accordance with the Prudent Utility Practice." (*Id.* ¶¶ 43, 135.)[13] From the Unit 4 Operating Agreement, as another example, Plaintiffs cite Article 2 (which creates an operating committee for Unit 4 and the responsibilities of that committee), Article 5 (which establishes certain operational issues, including ownership of the common coal stockpile used to run the generator and how power from the unit will be allocated), and Article 6 (which sets forth expectations for

---

[13] At best, those provisions impose a requirement that the Managing Board ensure any revised budget it adopts comply with the Prudent Utility Practice. As said many times, that did not happen here.

cooperation between the owners and an allocation of liabilities between them). Again, those provisions do not create some obligation to follow the Prudent Utility Practice while serving on the Managing Board. The Court will not summarize each provision, particularly when Plaintiffs make no effort to do so. But Plaintiffs' contractual path towards the Defendant Owners also fails at its second step.

Next, Plaintiffs add that the Unit 4 Accounting Agreement, "to which all Defendants are bound," requires Defendants to use a fair and equitable accounting policy and to otherwise act in a fair and equitable manner. (*Id.* ¶¶ 44, 137.) Only Plaintiffs and Georgia Power are parties to the Unit 4 Accounting Agreement. (Dkt. 65-4.) On its face, its provisions do not apply to Defendants MEAG, Oglethorpe, or Dalton. Plaintiffs identify no avenue for holding them accountable to it. And even if they could, the agreement does not impose the standard alleged for the reasons discussed above. Plaintiffs' contract path fails here as well.

From these steps, Plaintiffs reach the conclusion that, when the Managing Board discharges its duties to review the budgets proposed by Georgia Power, Defendants are required to do so in accordance with Articles 5, 7, 11 and Appendix A of the Managing Agreement, "that is,

using Prudent Utility Practice and, separately, fairly and equitably allocating costs." (Dkt. 65 ¶ 45.)[14]  Again, Plaintiffs cite no provision that requires this or any series of obligations that come together to impose this obligation.  Plaintiffs then say this means the Managing Board is required to do more than a simple "up or down" vote.  (*Id.*)  Plaintiffs don't even try to cite a provision for this allegation.

With all of this windup, Plaintiffs allege Defendants breached the Managing Agreement when they (1) "disregarded evidence" that the allocation of costs for the new facilities "was inconsistent with the Prudent Utility Practice, unfair and inequitable"; (2) "took no steps to independently determine" whether that allocation was consistent with "Prudent Utility Practice, fair and equitable"; (3) "refused to modify the budgets originally imposed by [Georgia Power] so as to bring them in accordance with Prudent Utility Practice and make them fair and equitable"; (4) refused to engage in meaningful dialogue "which is

---

[14] Notably, Plaintiffs do not even discuss Articles 7 or 11 while building their contractual claim; they just throw them in at the last step.  Article 7 discusses "Other Issues Requiring Managing Board Approval." (Dkt. 65-1 at 46–50.)  Article 11 sets forth how the Managing Agreement relates to the other existing agreements.  (*Id.* at 59–60.)  If they apply in this case, Plaintiffs have not explained how.

essential to exercising Prudent Utility Practice and a fair and equitable analysis"; (5) implemented an "unfair budget" that imposed costs on Plaintiffs for the new facilities; (6) rejected Plaintiffs' revised budget while claiming they could simply vote "up or down" without "regard for the Prudent Utility Practice, fairness and equity"; and (7) voted to approve the revised budget. (*Id.* ¶ 138(a)–(g).)

None of these allegations state a claim. As already explained, Plaintiffs have identified no provision that imposes the Prudent Utility Practice, fundamental fairness, or equity on Defendant Owners when they act as members of the Managing Board, and the Court can find none either. And the Prudent Utility Practice does not apply to the budgeting process that occurred for the 2021 and 2022 budgets at issue. And even if Plaintiffs could get past all of that, they cite no provision that even remotely suggests the Prudent Utility Practice or some sense of fairness and equity would require Defendants to make any independent determination of cost or contract interpretation, engage in "meaningful dialogue," "accept Plaintiffs' evidence," or vote in any way other than "yes" or "no." It really appears that Plaintiffs are simply riffing or improvising as to what they wish the contracts had said. By all accounts,

Defendant Owners followed the budgeting process, and Plaintiffs have thus failed to allege plausibly any breach of contract or covenant of good faith and fair dealing. The Court dismisses Plaintiffs' breach-of-contract claim against Defendant Owners.

### C. Count III

Plaintiffs assert a claim for declaratory judgment that "they are not responsible for costs in any way related to the design, construction, operation, maintenance, or closure" of the new facilities. (*Id.* ¶ 145.) As Plaintiffs have failed to state a substantive claim for breach of contract against Defendants, Plaintiffs' claim for declaratory judgment is also subject to dismissal. *See Hull v. CitiBank, N.A.*, 2013 WL 4955584, at *4 (N.D. Ga. Sept. 11, 2013) (dismissing plaintiff's claim for declaratory judgment after concluding all substantive claims failed to state a claim for relief).

### D. Count IV

Plaintiffs allege Georgia Power breached fiduciary duties it owes them by wrongfully imposing Plant Scherer Common Facility costs on them for the new facilities. (Dkt. 65 ¶¶ 161–62, 165–67.) Georgia Power says Plaintiffs' claim fails because it is duplicative of their breach of

contract claim and thus barred by Georgia's economic loss rule. (Dkt. 69-1 at 22–23.)  The Court agrees with Georgia Power.

"The economic loss rule generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *Gen. Elec. Co. v. Lowe's Home Centers, Inc.*, 608 S.E.2d 636, 637 (Ga. 2005) (internal quotation marks omitted).  In other words, "a plaintiff may not recover in tort for purely economic damages arising from a breach of contract." *Hanover Ins. Co. v. Hermosa Const. Grp., LLC*, 57 F.Supp.3d 1389, 1395 (N.D. Ga. 2014).  Where, however, "an independent duty exists under the law, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." *Liberty Mut. Fire Ins. Co. v. Cagle's, Inc.*, 2010 WL 5288673, at *3 (N.D. Ga. Dec. 16, 2010).

As Georgia Power points out, its duties to Plaintiffs arise exclusively from the parties' contracts.  (Dkt. 69-1 at 23.)  Plaintiffs hardly respond, saying Georgia Power owed and continues to owe fiduciary duties to Plaintiffs.  (Dkt. 77 at 22–23.)  Plaintiffs identify no independent duty under the law.  (*Id.*)  So the economic loss doctrine bars

Plaintiffs' claim for breach of fiduciary duty.  The Court dismisses that claim.

### E.    Pleading Deficiency

As discussed above, the Court has tried its best to understand Plaintiffs' tangled contract claims and believes it has addressed them fully.  But, in Count I, Plaintiffs also allege Georgia Power agreed it would not make any adverse distinction under the Participation Agreements. (Dkt. 65 ¶ 124.)  Georgia Power argues that Plaintiffs failed to allege that it *breached* this provision. (Dkts. 69-1 at 8 n.2.)  As a result, Georgia Power did not adequately address the issue.  The Court understands Georgia Power's reasoning.  After all, despite noting the "adverse distinction" provision in Count I, Plaintiffs did not expressly allege a violation of that provision when it alleged Georgia Power breached "the foregoing agreements by failing to follow Prudent Utility Practice, fairness, and equity." (Dkt. 65 ¶ 126.)  Plaintiffs did not allege in Count I, for example, that Georgia Power breached its obligation not to make adverse distinctions between Plaintiffs and other owners when it allocated costs.  Plaintiffs, on the other hand, insist this was part of their claim. (Dkt. 77 at 10.)

The Court finds the parties' briefing insufficient to evaluate this claim. The Court will allow Plaintiffs one final—and limited—chance to properly and clearly allege a breach of the adverse distinction provision and any derivative claims based on that provision. Should Plaintiffs seek to file another amended complaint to do so, they should keep in mind the federal pleading requirements, including Federal Rules of Civil Procedure 8–11. This means, among other things, any amended complaint must make a short and plain statement of the factual allegations supporting each claim, clearly identify which facts support which claim, and omit any material that is irrelevant, extraneous, convoluted, incoherent, confusing, distracting, conclusory, unfocused, vague, unclear, or otherwise hard to understand and tie directly to Plaintiffs' claims. Specifically, Plaintiffs should not incorporate hundreds of prior allegations to support their claim (which, in turn, incorporates hundreds of contractual provisions that are irrelevant or not clearly explained). Plaintiffs should not add any new claims or seek to re-assert the claims dismissed in this order. Plaintiffs may only add a claim that the allocation of costs violated applicable "no adverse distinction" provisions.

## IV.   Conclusion

Defendants' Motions to Dismiss are **GRANTED** (Dkts. 68, 69, 70, 71).  Plaintiffs may file an amended complaint consistent with this Order for the limited purpose stated.   The Court otherwise **DISMISSES** Plaintiffs' amended complaint (Dkt. 65).

**SO ORDERED** this 26th day of March, 2024.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE